UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Joshua Burns

    v.                                                           Civil No. 19-cv-007-LM
                                                          Opinion No. 2020 DNH 195 P

FNU Croteau, et al.

**O R D E R**

Plaintiff Joshua Burns, an incarcerated prisoner represented by counsel, brings this civil rights action against Corporal Jason Croteau, Sergeant Dwayne Sweatt, and an unspecified number of Doe defendants. All defendants are corrections officers employed by the New Hampshire Department of Corrections (the "DOC") at the Northern Correctional Facility for Men in Berlin, New Hampshire ("NCF Berlin"), and all are sued in their individual capacities only. Burns alleges that after he refused to obey an inappropriate order, Croteau and Sweatt beat him severely, causing serious injury. He further alleges that the Doe defendants failed to intervene to protect him. Arising out of that incident, Burns asserts Croteau's and Sweatt's liability under 42 U.S.C. § 1983 for violation of his Eighth Amendment right to freedom from excessive force while incarcerated, and under New Hampshire common law for assault and battery. In addition, Burns asserts the Doe defendants' liability under Section 1983 for failure to intervene.

Defendants move for summary judgment, arguing that Burns failed to exhaust his administrative remedies before bringing this action, thus depriving this

court of authority to consider his claims under the Prison Litigation Reform Act (the "PLRA"). Burns objects, arguing that he exhausted the administrative procedures available to him. Burns submitted a grievance of the incident but did not use the required form. In addition, he did not pursue the grievance procedure through its second and third steps, as is mandatory under the administrative process. Although Burns argues that proper exhaustion of the procedures was impossible both because he did not understand them and because he was transferred to a non-DOC facility a few days after the incident occurred, as a matter of law these issues did not render the administrative procedures effectively unavailable. The court therefore agrees with defendants that Burns failed to exhaust available administrative remedies as required under the PLRA.

## THE PRISON LITIGATION REFORM ACT

Under the Prison Litigation Reform Act, incarcerated plaintiffs must exhaust all available administrative remedies before bringing any federal action in respect to prison conditions. 42 U.S.C. § 1997e(a). For purposes of the PLRA, a civil rights action arising out of an isolated episode of unlawful misconduct by prison officials constitutes a challenge to prison conditions. See Porter v. Nussle, 534 U.S. 516, 532 (2002). Under the PLRA, federal courts lack discretion to consider any claim challenging prison conditions unless the exhaustion requirement has been satisfied, without regard to whether the remedy sought in the federal action was available under the institution's administrative procedure. See id. at 524 (citing Booth v.

Churner, 532 U.S. 731, 739, 740 n. 5 (2001)).  Requiring inmates to exhaust administrative remedies before suing in federal court "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court."  Jones v. Bock, 549 U.S. 199, 204 (2007).

"[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Id. at 218.  The Supreme Court has specified that "the PLRA exhaustion requirement requires proper exhaustion" of all administrative procedures in use at the prison.  Woodford v. Ngo, 548 U.S. 81, 93 (2006).  "[P]roper exhaustion" refers to "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)."  Id. at 90 (citation omitted; emphasis original).  The Woodford court reasoned that to require less than complete and proper exhaustion, including compliance with deadlines and all procedural requisites, would permit prisoners to render the PLRA exhaustion requirement "wholly ineffective."  Id. at 95.  That is, prisoners could default in the performance of administrative requirements and then claim exhaustion by virtue of their own procedural default.  See id.

Notwithstanding the foregoing, prisoners are only required to exhaust those administrative remedies that are effectively available to them.  A prisoner who fails to follow a prison's administrative grievance procedure through to its final step has nevertheless exhausted available administrative remedies where: (1) remedies are functionally unavailable because prison officials are "unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the administrative

procedure is too confusing, baroque, or flawed to be navigated to completion by a reasonable prisoner; or (3) prison officials thwart prisoners' efforts to exhaust available administrative remedies "through machination, misrepresentation, or intimidation." Ross v. Blake, 136 S. Ct. 1850, 1859-1860 (2016) (citing Booth, 532 U.S. at 736, 738).

Claims that have not been exhausted are subject to dismissal. See Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002). Defendants bear the burden to show both that administrative remedies were available and that the prisoner failed to exhaust them. See, e.g., Fuqua v. Ryan, 890 F.3d 838, 844 (9th Cir. 2018). If defendants make that showing, the burden shifts to the prisoner to come forward with evidence showing that the existing and generally available administrative remedies were effectively unavailable to him. See id.

The First Circuit has not addressed whether factual issues regarding exhaustion are the province of the judge or the jury. However, all the circuit courts that have considered the question have held that it is for the court rather than a jury to resolve such issues. See, e.g., Albino v. Baca, 747 F.3d 1162, 1170-1171 (9th Cir. 2014) ("disputed factual questions relevant to exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue"); see also Lee v. Willey, 789 F.3d 673, 678 (6th Cir. 2015); Small v. Camden Cty., 728 F.3d 265, 271 (3rd Cir. 2013); Messa v. Goord, 652 F.3d 305, 309 (2nd Cir. 2011); Dillon v. Rogers, 596 F.3d 260, 271 (5th Cir. 2010); Pavey v. Conley, 544 F.3d 739, 741 (7th Cir. 2008) (en banc); Bryant v.

Rich, 530 F.3d 1368, 1376 (11th Cir. 2008). The court agrees that it may appropriately, and indeed must, resolve any material factual disputes bearing on the question of exhaustion for purposes of defendants' motion. If these questions were left for a jury to decide, inmate litigants could circumvent the gatekeeper function of the PLRA and bring cases in federal court without first exhausting administrative remedies, simply by asserting that such remedies were unavailable.

At summary judgment, to prevail on the affirmative defense of failure to exhaust, prison officials must show that no factfinder could reasonably conclude that plaintiff exhausted available remedies before filing suit. See Polansky v. McCoole, Case No. 13–cv–458–JL, 2016 WL 237096, at *3 (D.N.H. Jan. 20, 2016).

## BACKGROUND

The following facts are drawn from the record. Where the material facts are disputed, the court has resolved the disputes under the applicable legal standard as stated below.

I. The Incident of April 27, 2016

On April 27, 2016, while Burns was an inmate at NCF Berlin, defendant Sweatt ordered Burns to perform "extra duty cleaning the walls." Burns refused, stating that he had performed his extra duty obligations on the previous day. Sweatt responded by striking him with a bottle containing cleaning fluid, throwing

rags in his face, and demanding Burns's obedience.  Burns did not comply with Sweatt's order, but rather returned to his housing unit.

A short time thereafter, Croteau and Sweatt entered the unit and began searching other inmates' cells, stating that they would "keep trashing everyone's shit" until Burns agreed to perform extra duty as ordered.  Burns continued to refuse the officers' order.  Sweatt ordered Burns to stand and face the wall so he could be cuffed, and Burns complied.  Sweatt seized Burns's body and threw him face-first into the wall, then placed Burns in handcuffs while twisting his arms painfully.  Sweatt and Croteau then escorted Burns to a holding cell, where they asked him questions.  Burns did not respond to any of the questions.  Angered by Burns's silence, Sweatt and Croteau threw Burns against the wall and then to the floor, all while he was still cuffed and unable to use his arms to protect himself.  He suffered severe injury to his right arm and shoulder.  Sweatt and Croteau then held Burns down with their knees on his back, while staff members unknown to Burns removed his socks, shorts, and undergarments, leaving him naked from the waist down. At no time during the incident did Burns resist the officers or attempt to defend himself.

Some time thereafter, Burns was permitted to report to medical to be seen for the injury to his right arm and shoulder.  Medical staff gave Burns a sling for his arm.

6

II.   The Administrative Remedy Program at NCF Berlin

The DOC maintains an administrative remedy program (the "Grievance Process") at NCF Berlin "through which inmates/residents seek formal review of an issue related to any aspect of their confinement. . . ." DOC Policy and Procedure Directive ("PPD") 1.16(I), eff. July 30, 2015 (doc. no. 21-4). The Grievance Process is intended to facilitate resolution of any issue concerning conditions of confinement, including mistreatment or abuse by corrections officers.  The Process "provides a three tiered system for filing a grievance that includes an appeal process." PPD 1.16(III)(F).

At the first level, an inmate must file a grievance using an Inmate Request Slip within thirty days after the date of the incident giving rise to the complaint. See PPD 1.16(IV)(A)(1).  The Inmate Request Slip must be "addressed to the lowest level staff person with the authority to address the issue raised." PPD 1.16(IV)(A)(3).  The appropriate staff member will respond to an Inmate Request Slip within fifteen days after it is received.  If an inmate can demonstrate that use of an Inmate Request Slip would result in an "identifiable risk of harm" to the inmate's safety or well-being, the inmate may seek a waiver in order to proceed directly to the second level of the system.  PPD 1.16(IV)(A)(4).  The inmate must request such a waiver from the NCF Berlin Warden within thirty days after the date of the incident giving rise to the complaint.

At the second level of the Process, an inmate must file a grievance directed to the Warden on a Grievance Form.  See PPD 1.16(IV)(B).  The level two grievance

7

must be filed within thirty days after the inmate receives a response to the initial Inmate Request Slip. The Warden will respond to a level two grievance within thirty days after it is received, subject to a fifteen-day extension. An inmate dissatisfied with the Warden's response may proceed to the third step of the system by addressing a Grievance Form to the DOC Commissioner within thirty days of the date of the Warden's response. See PPD 1.16(IV)(C).

The timeframes for filing grievances at all three levels of the Process are "mandatory." PPD 1.16(IV)(E). Failure to file a grievance within the mandatory timeframe will result in summary dismissal of the grievance as untimely. However, if "an inmate can demonstrate a valid reason for delay," the inmate can request an extension of an applicable time limit. PPD 1.16(IV)(H).

The Inmate Request Slips and the Grievance Forms are "carbonless triplicate forms." PPD 1.16(IV)(F). Filling out one of the forms generates three copies: one to be retained by Offender Records, one to be retained by the responding official, and one to be returned to the filing inmate. Use of the appropriate form is mandatory at each level of the three-tiered system. Any grievance filed by a DOC inmate "will be returned unanswered" if submitted on the wrong form. Id.

Inmates housed at any facility other than a DOC facility who wish to grieve an incident that occurred at a DOC facility like NCF Berlin must use the same three-tiered system available to NCF Berlin inmates, including its mandatory timeframes. See PPD 1.16(IV)(G)(3). Such inmates may request Inmate Request Slips or Grievance Forms from Offender Records. See PPD 1.16(IV)(I). However,

an instruction printed on the back of the Inmate Request Slip form states that inmates housed at a facility other than a DOC facility "may use stationery rather than Inmate Request Slips."  Doc. no. 21-2, at 6; see also doc. no. 26-1, ¶ 10, Exh. B.

It is the "normal and routine practice" to provide inmates with copies of an "inmate handbook" when they first come into DOC custody.  Doc. no. 21-2, at 4.  In addition, NCF Berlin maintains copies of the inmate handbook and of PPD 1.16 at its law library.  See id.  Inmates may view those materials at the law library or may request copies by filing an Inmate Request Slip and paying a copying fee.

III.   Burns's Efforts to Grieve the Incident of April 27, 2016

Burns claims he did not receive a copy of the inmate handbook when he came into custody at NCF Berlin.  However, his deposition testimony establishes that he had reasonable working knowledge of how to use the Grievance Process, and he concedes that he used it regularly.  See Burns Depo., 17:2-22:19, 28:23-29:4, 36:8-22, 39:16-21, 54:8-55:7.  As of April 27, 2016, Burns had spent in excess of eight years in custody at various DOC facilities, including both NCF Berlin and the State Prison for Men in Concord, NH.  During that time, he filed "a lot" of grievances on Inmate Request Slips, and he understood their purpose and how to fill them out.  See id. Burns successfully pursued and obtained his requested remedies through the Grievance Process on at least some occasions.  See id., 39:16-21. He learned how to use the administrative remedy program in part "just from being" in DOC

9

facilities, id.,-19:5, and in part from reading the instructions on the backs of the forms, see id., 22:15, 28:14-22.

Burns attempted to grieve the incident of April 27, 2016. Because his injury prevented him from writing, he recruited the assistance of another inmate to write the grievance while Burns dictated. With the other inmate's assistance, Burns described the incident in detail, and requested an investigation. See doc. no. 21-6 at 5-11.

Burns did not submit his grievance on an Inmate Request Form, as is appropriate at the first level of the grievance process, but rather on a Grievance Form, the form appropriate for use at the second and third levels of the process. See id. There is no indication in the record that Burns requested or received a waiver of the Inmate Request Slip level of the process. However, Burns knew where to find Inmate Request Slips and that they were easily obtainable. See Burns Depo., 51:23-53:2.

The Grievance Form that Burns submitted bears the handwritten date "April 27, 2016," and is stamped "Received" as of May 2, 2016. The Grievance Form does not specify an addressee, as is required under the Grievance Process. Burns never received any response to the Grievance Form of April 27, 2016. The parties dispute whether Burns grieved the incident on an Inmate Request Slip prior to submitting the Grievance Form. Defendants offer the testimony of Kevin Stevenson, the DOC Supervisor of Offender Records, that he searched Burns' offender file and determined that the sole grievance Burns submitted in connection with the incident

was the Grievance Form of April 27, 2016.  See Doc. 26-1, ¶¶ 11-12.  However, Burns testified to the contrary, albeit somewhat equivocally, at his deposition. Upon being asked whether he filed an Inmate Request Slip before filing the April 27, 2016 Grievance Form, Burns initially responded, "I don't remember. I could have quite possibly."  Burns Depo., 41:16-17.  Upon being asked the same question immediately thereafter in slightly different terms, Burns testified as follows:

> A    I believe I did.
> Q    You did?
> A    Yes, to Lieutenant McFarland. I never received a response.

Id., 41:21-42:1.

The court finds that, despite his testimony, Burns did not submit a grievance of the incident on an Inmate Request Slip prior to submitting his Grievance Form. First, as noted, defendants have proffered plausible evidence that Burns did not submit a grievance of the incident on an Inmate Request Slip.  See Doc. 26-1, ¶¶ 11-12. Second, it appears on the face of Burns's testimony that his recollection is imperfect. Burns rapidly changed his testimony from not remembering whether he filed an Inmate Request Slip to affirming that he did, with almost no intervening passage of time.  See Burns Depo., 41:16-42:1.  Third, Burns had previously testified to the circumstances in which he transcribed his grievance, and he recognized the Grievance Form as the form he had used for that purpose.  See id., 29:15-30:12. Fourth, the Grievance Form does not reference any prior grievance, and it describes the incident as having just occurred.  See doc. no. 21-6 at 5-11.  Fifth, as Burns testified, filling out an Inmate Request Slip generates three copies, see Burns Depo.,

11

19:12-20:5, one of which is to be retained by the inmate at the time he submits the Slip, see PPD 1.16(IV)(F).  However, Burns does not suggest that he ever possessed any such copy.  Sixth and finally, Burns's testimony is facially implausible, in that the timeframe is too compressed for events to have occurred as he describes them.  According to his testimony, before filing the Grievance Form, he first filed a similar grievance on an Inmate Request Slip to which he received no response.  See Burns Depo., 42:1.  But the Grievance Form bears the handwritten date April 27, 2016 and is stamped received as of May 2, 2016.  There was simply insufficient time for Burns to have submitted a level-one grievance on the correct form and waited for a response that was not forthcoming before he filed the Grievance Form that is in the record.  On these facts, no finder of fact could reasonably conclude that Burns filed a grievance of the incident on an Inmate Request Slip prior to filing the Grievance Form.

On May 2, 2016, Burns was transferred to the Carroll County Correctional Facility (the "County Jail")[1] for his own safety pending investigation of the incident.  While Burns was housed at the County Jail, he had access to and utilized mail services.  However, Burns did not file or mail any further grievances regarding the incident of April 27, 2016 while he was housed at the County Jail.

Burns was transferred back to NCF Berlin on June 10, 2016.  After his return to NCF Berlin, unspecified prison staff members advised him that he needed to wait until he received a response to his initial grievance "from the warden" before

---

[1] The County Jail is not a DOC facility.

he could file any further grievance or appeal.  Id., 38:13-18, 44:20-45:1.  For that reason, Burns did not file a second- or third-level grievance in connection with the incident.

## DISCUSSION

It is undisputed that Burns did not pursue all three levels of the DOC Grievance Process to completion.  The question for the court is whether the procedures of the Grievance Process were effectively available to Burns under the applicable circumstances.

Burns argues, first, that the DOC procedures were effectively unavailable to him because he did not receive an inmate handbook when he first arrived at NCF Berlin.  However, "[t]he PLRA does not excuse a failure to exhaust based on a prisoner's ignorance of administrative remedies, so long as the prison has taken reasonable steps to inform the inmates about the required procedures."  Ramirez v. Young, 906 F.3d 530, 538 (7th Cir. 2018) (citing Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000)).  Here, even assuming Burns did not receive an inmate handbook upon arrival, it is undisputed that NCF Berlin made copies of the Grievance Process available to inmates at its law library and that its standard procedure was to provide copies of the inmate handbook (containing a description of the Process) to new inmates upon their arrival at the institution.  See doc. no. 21-2, at 4.  Moreover, Burns had a reasonable working understanding of the Grievance Process, had filed numerous grievances on Inmate Request Forms, and had on at

13

least some occasions successfully pursued the process to completion. See Burns Depo., 17:2-22:19, 28:23-29:4, 36:8-22, 39:16-21, 54:8-55:7. Thus, any failure to provide Burns with a copy of the inmate handbook could not have rendered the procedures of the Grievance Process unavailable to him. See Ramirez, 906 F.3d at 538.

In the alternative, Burns argues that the Grievance Process was effectively unavailable to him while he was housed at the County Jail. But "[t]he fact that [an inmate] happened to be a prisoner in various locations, and under the custody of different officials, does not affect his obligation to exhaust his administrative remedies before filing suit." Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 35 (1st Cir. 2002); see also Joslin v. Hampshire Cty. House of Corr., Case No. 11-30175-KPN, 2013 WL 2247499, at *8 (D. Mass. Feb. 28, 2013) (transfer to a different facility does not relieve an inmate of the obligation to exhaust administrative remedies available at the former institution). And Burns could have pursued the DOC Grievance Process while housed at the County Jail either by requesting the appropriate forms from Offender Records, see PPD 1.16(IV)(I) (doc. no. 21-4, at 5), or by writing a letter on ordinary stationery addressed to an appropriate staff member or the Warden at NCF Berlin, see doc. no. 21-2, at 6, doc. no. 26-1, ¶ 10, Exh. B. Burns's temporary transfer to the County Jail did not render the DOC Grievance Procedures effectively unavailable to him.

Third and finally, Burns argues that the Grievance Process became unavailable to him after his return to NCF Berlin from the County Jail, when he

14

was told by an unidentified staff member not to file any follow-up to his initial grievance until he received a response to it.  See Burns Depo., 38:13-18, 44:20-45:1.  However, the court need not address this argument.  This is so because even on the assumption that the Grievance Process became unavailable to Burns after he received that advice, he still defaulted procedurally before that occurred by filing his initial grievance on the incorrect form and by failing to specify an addressee on that grievance.  See PPD 1.16(IV)(A)(1) (doc. no. 21-4, at 2); PPD 1.16(IV)(F) (doc. no. 21-4, at 5).  These procedural defaults deprive this court of authority to consider Burns's claims.  See Woodford, 548 U.S. at 90, 93.

The evidence establishes that the procedures outlined in PPD 1.16 were available to Burns at all material times, and that he did not pursue those procedures either properly or to exhaustion.  Accordingly, defendants have established their entitlement to summary judgment on their PLRA exhaustion defense.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (doc. no. 21) is granted.  The Clerk is directed to enter judgment and close this case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

November 6, 2020
cc:    Counsel of Record.